UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Neil Mehta,                                      No. 19-cv-2631 (MJD/DTS)

      Plaintiff,

v.

                                  **REPORT AND RECOMMENDATION**

Angell Energy, LLC;
Chesapeake Trading Group, LLC;
Pegasus Energy Futures, LLC;
Apollo Energy Services, LLC
Diversified Trading Company, LLC
Timothy Krieger; John and Jane Does 1-10;
and ABC Corps. 1-10,

      Defendants.

---

Michael J. Minenko, Minenko Law, LLC, 2051 Killebrew Drive, Suite 611, Bloomington, Minnesota 55425; Robert A. Diehl, Bittiger Elias & Triolo P.C., 12 Route 17 North, Suite 206, Paramus, New Jersey 07652, for Plaintiff.

Ryan M. Lawrence and Janel M. Dressen, Anthony Ostlund Baer & Louwagie P.A., 90 South Seventh Street, Suite 3600, Minneapolis, Minnesota 55402, for Defendants.

---

## INTRODUCTION

      Plaintiff Neil Mehta first brought this action for unpaid wages and bonuses in New Jersey federal court in February 2018. It is now March 2020. Yet, after a protracted battle over jurisdiction and forum, the litigation is now in this District and has not advanced past the pleading stage. The last barrier to this case progressing to discovery is Defendants'[1]

---

[1] All Defendants other than Angell Energy, LLC and the pseudonymous "placeholder" defendants join in the motion. As to Angell, the sides disagree whether it is even a party to the case. *Compare* Mem. Supp. Defs.' Mot. Dismiss 1 n.1, Dkt. No. 41, *with* Pl.'s Mem. Opp. 9-10, Dkt. No. 52. The Court cannot find any order from the prior court

motion to dismiss for failing to state a claim on two of the four counts—and, by effect, all but two of the named Defendants—in Mehta's Amended Complaint.

At bottom, Mehta's action seeks to recover certain wages and bonuses he alleges he earned, but was not paid, during his employment as an energy futures trader at both Angell Energy and Chesapeake Trading Group. But Mehta goes further, alleging a scheme by Krieger to undercapitalize successive business ventures in an attempt to avoid each prior entity's liabilities. The Moving Defendants argue that Mehta's Amended Complaint fails to state a claim for either successor liability or piercing the corporate veil under Minnesota law, and those two "counts" should therefore be dismissed. The Court disagrees. Because Mehta has plausibly alleged both a pattern of conduct intended to avoid existing liabilities and abuse of the corporate form, he has plausibly alleged both successor liability and veil-piercing. Defendants' motion should be denied.

## FINDINGS OF FACT[2]

In March 2014, Twin Cities Power, LLC hired Mehta as an energy futures trader. Am. Compl. ¶ 24, Dkt. No. 23. Timothy Krieger (or another entity he owned, Diversified Trading Company) owned and controlled Twin Cities Power. *Id.* at ¶ 26. Mehta worked for Twin Cities Power from the company's East Windsor, New Jersey office, under Patrick Sunseri, the company's "President of Trading." *Id.* at ¶¶ 24, 27. Twin Cities Power gave

---

actually dismissing Angell as a defendant in this action. However, because the present motion does not implicate Angell, the Court need not address that issue now.

[2] On a motion to dismiss under Rule 12(b)(6), the Court accepts all of Plaintiffs' factual allegations in their Amended Complaint as true, *e.g.*, *Schaller Tel. Co. v. Golden Sky Sys., Inc.*, 298 F.3d 736, 740 (8th Cir. 2002), including those made on information and belief.

Mehta both a base salary and quarterly bonus incentives, which were a percentage of the company's profits generated by Mehta's trades. *Id.* at ¶ 25.

A little over a year after Mehta began working at Twin Cities Power, Krieger sold the business to Angell Energy, which was owned by Michael Angell, Krieger's high school classmate. *Id.* at ¶¶ 28-29. Mehta alleges on belief Krieger sold Twin Cities Power to evade growing financial liabilities. *Id.* at ¶ 30. Upon taking over Twin Cities Power, Angell Energy authorized Apollo Energy, a management service company Krieger (or another Krieger-owned entity) owned, to run its energy futures trading business.[3] *Id.* at ¶¶ 31, 84. This arrangement gave Krieger control of the management and operations of Angell Energy. *Id.* at ¶ 32. Krieger himself told Mehta that, although Mehta would be working for Angell Energy now, the logistics of Mehta's employment would otherwise go unchanged. *Id.* at ¶¶ 33, 36. Following the purchase of Twin Cities Power, Mehta continued to work as an energy futures trader out of the same East Windsor, New Jersey office under Patrick Sunseri, with same co-employees, and using the same proprietary trading platform he had previously used. *Id.* at ¶¶ 36-39. He continued to interact with the same human resources personnel and other support from Minnesota. *Id.* at ¶ 40. The only changes for Mehta were a $10,000 increase in his base salary and a new domain name for his email address. *Id.* at ¶¶ 36, 41.

Mehta worked for Angell Energy for eleven months, until Krieger shut down Angell in May 2016 and replaced it with another energy futures trading company, Chesapeake Trading Group. *Id.* at ¶¶ 42, 45. In that time, Mehta earned approximately $375,000.00

---

[3] Mehta believes Apollo also owns the proprietary trading software used by each successive entity. Am. Compl. ¶¶ 80, 83.

from trading bonuses, but was not paid either this bonus or the last two weeks of his May 2016 base salary when Angell Energy closed. *Id.* at ¶¶ 43-44. Krieger is the sole owner of Chesapeake Trading Group. *Id.* at ¶ 46. Krieger held a telephone conference with Mehta and the other employees working in the East Windsor, New Jersey office regarding the transition from Angell Energy to Chesapeake Trading and acknowledged that he owed Mehta and others for unpaid bonuses. *Id.* at ¶¶ 47-48.

Krieger offered Mehta a $50,000.00 signing bonus to join Chesapeake Trading and as partial satisfaction of his unpaid bonus from Angell. *Id.* at ¶ 49. Mehta believes Krieger made similar signing bonus offers to other employees in the East Windsor office. *Id.* at ¶ 50. Krieger's offer to Mehta contemplated that Mehta would continue to work out of the same office where he had worked for the prior two businesses. *Id.* at ¶ 52. Mehta accepted the offer and, other than another base salary increase, his work at Chesapeake Trading remained identical: same office, same supervisor and co-employees, same phone number, same proprietary trading platform, and same support from the same Minnesota office. *Id.* at ¶¶ 53, 55, 57. Mehta's new employment agreement included an acknowledgment that he had received an employee handbook for Krieger Enterprises, LLC, which is now known as Diversified Trading Company. *Id.* at ¶ 54. Mehta worked as an energy futures trader at Chesapeake Trading for a little over a year, during which time Krieger doubled his base salary to $240,000. *Id.* at ¶¶ 56-58.

Then, in July 2017, Krieger shut down Chesapeake Trading and opened Pegasus Energy Futures in its place. *Id.* at ¶ 59. At the time Chesapeake Trading closed, it owed Mehta 15 days of salary, 15 days of unused paid time off, and approximately $40,000.00 for unpaid trading bonuses. *Id.* at ¶ 60. Although Krieger did not officially own Pegasus,

4

he retained effective control of management and operations. *Id.* at ¶ 61. Mehta received representations that employment with Pegasus was offered to the same personnel as Chesapeake Trading, and that he would continue to work as an energy futures trader in the same East Windsor office and use the same proprietary trading platform. *Id.* at ¶¶ 62-64. Krieger directly contacted Mehta and offered him another signing bonus, this time for $30,000.00, to partially satisfy the past unpaid trading bonuses. *Id.* at ¶ 67. He also offered an additional bonus of 25% on the first $1,200,000.00 of profit from Mehta's trades at Pegasus, to count toward the unpaid trading bonuses. *Id.*

As part of the transition from Chesapeake Trading to Pegasus, Patrick Sunseri drafted resignation letters for Mehta and the other employees at the East Windsor office and sent them to the individuals to review and sign. *Id.* at ¶¶ 70-71. However, Mehta was now alarmed by what he saw as Krieger's pattern of starting a company, only to shut it down and open a new one in its place. *Id.* at ¶ 72. Because Mehta did not think Krieger would pay the outstanding trading bonuses as promised and feared only more of the same if he continued with Krieger, Mehta declined the employment offer with Pegasus, and instead found other employment in the energy futures industry. *Id.* at ¶¶ 75-77.

Several months later, Mehta brought this action to recover the allegedly unpaid wages and bonuses. Counts One and Two of his Amended Complaint state claims for unpaid wages against Angell Energy and Chesapeake Trading, respectively. Count Three alleges a theory of successor liability against Chesapeake, Pegasus, and a number of pseudonymous ABC Corporations that may be Pegasus's successor entities. *Id.* at ¶¶ 99-111. Count Four alleges that Krieger, and possibly others, engaged in a scheme of

undercapitalization, warranting a piercing of the limited liability veil to hold Krieger and all other named Defendants jointly and severally liable. *Id.* at ¶¶ 112-21.

## CONCLUSIONS OF LAW

Moving Defendants contend that Counts Three and Four of the Amended Complaint should be dismissed because Mehta has failed to state a claim against any Defendant that did not directly employ him, under either a successor liability or veil-piercing theory.[4] More specifically, because both of Mehta's theories to expand liability would require a finding of fraud, Moving Defendants argue the Amended Complaint must, but fails to, satisfy the heightened pleading standard of Rule 9(b), rather than the "plain and short statement" required by Rule 8, of the Federal Rules of Civil Procedure. Mehta does not dispute that his pleading is subject to Rule 9(b), but argues that it satisfies that standard under either Minnesota or New Jersey substantive law. The parties also disagree about what documents outside the pleadings the Court may consider on the present motion. As explained below, the Court agrees that Mehta's Amended Complaint, unsupported by extraneous materials, states a claim against Moving Defendants under the relevant Minnesota substantive law.

---

[4] Successor liability and veil-piercing are both doctrines of recovery, rather than freestanding claims for relief. *Tamko Roofing Prods., Inc. v. Smith Eng'g Co.*, 450 F.3d 822, 826 n.2 (8th Cir. 2006) (noting that "piercing the corporate veil . . . is best thought of as a remedy to enforce a substantive right, and not as an independent cause of action"); *see also Nutt v. Kees*, 796 F.3d 988, 990 (8th Cir. 2015) ("[Successor] liability allows a plaintiff *with a claim* against the seller to collect from the purchaser.") (emphasis added).

# I.    Legal Standard

## A.    Rule 12(b)(6) dismissal

A motion to dismiss under Rule 12(b)(6) tests the facial plausibility of a complaint. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and 'that a recovery is very remote and unlikely.'" *Id.* at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). A court considering dismissal under 12(b)(6) examines whether a complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Beyond accepting the pleaded facts as true, a court may draw reasonable inferences from the complaint, and must construe any such inferences in favor of the nonmoving party. *Ryan v. Ryan*, 889 F.3d 499, 505 (8th Cir. 2018). However, a court may ignore "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678.

## B.    Relevant pleading standards

To survive a motion to dismiss, a complaint must normally satisfy Federal Rule of Civil Procedure 8, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). Although the Supreme Court has held that this standard requires factual pleadings sufficient to show plausibility, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations[.]" *Twombly*, 550 U.S. at 555.

Rule 8 does not govern all pleadings. No party to the present motion disagrees that, at least for Counts Three and Four, Mehta's Amended Complaint falls within the

ambit of Rule 9(b), which requires a party pleading fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Courts have frequently summarized Rule 9(b) as requiring a complaint to "plead the 'who, what, where, when, and how' of the alleged fraud." *Ambassador Press, Inc. v. Durst Image Tech. U.S., LLC*, 949 F.3d 417, 421 (8th Cir. 2020). Still, the Rule is not rigid to the point of absurdity, but rather allows a complaint to allege "[m]alice, intent, knowledge, and other conditions of a person's mind" generally. Fed. R. Civ. P. 9(b); *see also Ambassador Press*, 949 F.3d at 421 ("When the facts constituting the fraud are peculiarly within the opposing party's knowledge, however, such allegations may be pleaded on information and belief.") (quoting *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009)).

Rule 9(b) is also not a blanket that envelops all allegations merely because some portion of a complaint alleges fraudulent conduct. As one leading commentary has stated, "Because the rule is a special pleading requirement and contrary to the general approach . . . adopted by the federal rules, its scope of application should be construed narrowly." 5A Arthur R. Miller, Mary Kay Kane, and A. Benjamin Spencer, *Federal Practice & Procedure* § 1297 (4th ed.). Therefore, "when the complaint alleges both fraudulent and non-fraudulent conduct, only the former must satisfy the particularity requirements under Rule 9(b)." *Id.* (citing, *inter alia*, *Sherman v. Network Commerce, Inc.*, 94 F. App'x 574, 575 (9th Cir. 2004)). Although Rule 9(b) applies "in whatever substantive or factual context fraud might arise[,]" *id.*, this Court is left to determine whether a particular claim against particular defendants actually sounds in fraud. Because that analysis depends upon the specific allegations underpinning each claim, the Court will identify the applicable pleading standard in its analysis of the individual claims.

8

## II.    Applicable Substantive Law

Neither side seriously disputes that Minnesota, rather than New Jersey, substantive law governs this diversity action. As Defendants note, both Mehta's employment agreement with Twin Cities Power (which Angell Energy took over following the sale) and his agreement with Chesapeake Trading contain the same governing law provision:

> The laws of the State of Minnesota will govern the validity, construction and performance of this Agreement. Any legal proceedings related to this Agreement will be brought in an appropriate Minnesota court, and both the COMPANY and the EMPLOYEE hereby consent to the exclusive jurisdiction of that court for this purpose.

Decl. of Timothy Krieger Ex. A, at § 10(e); Ex. E, at § 10(e); ¶ 13, Dkt. No. 5. Minnesota, which provides the choice-of-law rules for this Court, "traditionally enforces parties' contractual choice of law provisions[.]" *Hall v. St. Jude Med. S.C., Inc.*, 326 F. Supp. 3d 770, at 777 (D. Minn. 2018) (quoting *Hagstrom v. Am. Circuit Breaker Corp.*, 518 N.W.2d 46, 48 (Minn. Ct. App. 1994)). The New Jersey district court previously found the forum selection clause of the provisions to be valid and enforceable as to all the parties, including the non-signing Defendants. Mem. Opinion, Sept. 30, 2019, at 8-17, Dkt. No. 33. Mehta does not challenge that analysis and the Court sees no reason to do so. The choice-of-law provision of Mehta's employment agreements is valid and enforceable.

Further, the choice-of-law provision extends to the present action. By its language, the provision is narrow, applying only to claims arising under the employment agreements themselves. *St. Jude Med. S.C.*, 326 F. Supp. 3d at 777 ("A governing-law clause that 'provides that the contract will be 'governed by' or 'construed' under the laws of a particular state is a narrow clause.") (cleaned up). Mehta's claims plainly arise under the

employment agreements, as he seeks contractually-agreed upon wages, bonus pay, and personal time off he alleges he is still owed. *E.g.*, Krieger Decl. Ex. A, at § 4. True, Mehta alleges fraud by at least some of the Defendants, and fraud as a claim sounds in tort, not contract, law. *Cf. Ransom v. VFS, Inc.*, 918 F. Supp. 2d 888, at 895 (D. Minn. 2013) (noting that the "general rule holding corporate officers liable for their own torts applies to fraud as well as" other torts). But Mehta does not actually bring a claim for fraud; any allegations of fraud in his Amended Complaint merely bolster his attempt to expand liability beyond the signing Defendants. Because the choice-of-law provision in Mehta's employment agreements is valid and enforceable in the present lawsuit, this Court will forgo a traditional choice-of-law analysis and will apply Minnesota law, as Mehta agreed to when he signed both employment agreements.

## III.    Outside Matters to Consider

The parties disagree as to what, if anything, the Court may consider outside the Amended Complaint. A court considering a motion to dismiss under Rule 12(b)(6) generally may not consider matters outside the pleadings, at least not without converting the motion into one for summary judgment. Fed. R. Civ. P. 12(d); *Gorog v. Best Buy Co., Inc.*, 760 F.3d 787, 791 (8th Cir. 2014). "Matters outside the pleadings" include "any written or oral evidence in support of or in opposition to the pleading that provides some substantiation for and does not merely reiterate what is said in the pleadings." *Gorog*, 760 F.3d at 791. But in the Eighth Circuit, a court may consider "documents necessarily embraced by the complaint[,]" such as documents attached to it and "documents whose contents are alleged in a complaint and whose authenticity no party questions," without converting the motion into one for summary judgment. *Ashanti v. City of Golden Valley*,

666 F.3d 1148, 1151 (8th Cir. 2012). A court may also consider "some materials that are part of the public record or do not contradict the complaint . . . ." *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

### A.    Timothy Krieger's declaration

Mehta argues the present motion must be converted to one for summary judgment—and then be denied—because Moving Defendants cite to exhibits attached to a declaration submitted by Timothy Krieger earlier in this case. Such a conversion is unnecessary. Rule 12(d) requires this Court to convert a motion to dismiss into one for summary judgment only if outside matters "are presented to and *not excluded by* the court . . . ." Fed. R. Civ. P. 12(d) (emphasis supplied). That is, a court may at least view the outside matters to determine whether they are embraced by the complaint or may otherwise be properly considered on a motion to dismiss. *See Gorog*, 760 F.3d at 791 (finding the district court did not err in considering specific documents embraced by the pleadings while ignoring the other "voluminous documents" defendant submitted with its motion to dismiss). Krieger submitted his declaration in support of dismissal for lack of personal jurisdiction, and so it addresses the structure of the various corporate entities he controlled and their relationship to each other. Krieger Decl. ¶ 1; Br. in Supp. of Defs.' Mot. to Dismiss 3, at n.3, Dkt. No. 5-1. As such, much of the declaration and the attached exhibits are not embraced by the Amended Complaint and, more importantly, may contradict it. Most of Krieger's declaration must be excluded from this Court's consideration of the present motion.

The rest of Krieger's declaration aside, the Court may consider the two exhibits Moving Defendants cited, which were the employment agreements Mehta signed with

Twin Cities Power and Chesapeake Trading, respectively.[5] These agreements (and any addenda) set the terms of Mehta's employment with the respective enterprises, including his salary, benefits, and bonus structure. *See generally* Krieger Decl. Ex. A, Ex. E. Mehta's claims therefore arise under these employment agreements and they are logically embraced by his pleadings, even if he did not attach the documents to his Amended Complaint. *Gorog*, 760 F.3d at 791-92 (finding that plaintiff's complaint for an allegedly unpaid performance award necessarily embraced plaintiff's employment agreement and related documents). Moreover, Moving Defendants cited the employment agreement as part of their threshold argument on the choice of law question. Even if this Court could not consider the agreements for any other purpose, it must logically be able to do so to analyze the validity of the choice of law provision Moving Defendants sought to enforce. As a practical matter, the Court sees no need to consider the employment agreements for any other purpose on this motion.

## B.    Aspirity bankruptcy proceedings

For their part, the Moving Defendants object to Mehta's at-length description of the bankruptcy proceedings of Aspirity Energy, LLC, and related proceedings involving Aspirity Financial, LLC. In short, Mehta argues the bankruptcy proceedings, which are public record, bolster the plausibility of his claims in two ways. First, the bankruptcy court found that another entity with ties to Krieger had abused the corporate form. Pl.'s Mem. 6-7. Second, during a Rule 2004 examination in those proceedings, Krieger invoked his

---

[5] The Moving Defendants cite Exhibits A and D of Krieger's declaration. Although Exhibit A is a copy of Mehta's employment agreement with Twin Cities Power, Exhibit D is a written consent by the governing board of Twin Cities Power. Defendants clearly intended to cite Exhibit E, which is Mehta's employment agreement with Chesapeake Trading.

Fifth Amendment right against self-incrimination when asked about statements he made in the previously discussed declaration. *Id.* at 8-9. Although Mehta does not directly ask the Court to draw an adverse inference from Krieger's actions, the implied request is clear.

The Court will disregard the Aspirity bankruptcy proceedings for the present motion. As noted, this Court may take judicial notice of "[s]ome materials that are part of the public record[,]" *e.g.*, *Levy v. Ohl*, 477 F.3d 988, at 991 (8th Cir. 2007), and the filings and docket of a bankruptcy court are, with exceptions, part of the public record, 11 U.S.C. § 107(a). And although neither Krieger nor another named Defendant is a party to the bankruptcy proceedings, those proceedings are relevant to Mehta's allegations regarding Krieger's business practices. However, this Court hesitates to extend so broadly its discretionary ability to look outside the pleadings. It is entirely consistent with Rule 12's purpose of cutting short fatally flawed litigation to consider, for instance, a record of vital statistics or a public document that squarely and unquestionably answers whether a complaint falls outside the statute of limitations. It is also appropriate, as this Court has done previously, to consider judicial records for their preclusive effect, rather than for the truth of the facts set forth in those records. But as another district court has observed, it would entirely vitiate the Rule 12(b)(6) standard for critical facts "to be slipped into evidence on a motion to dismiss, without foundation or an opportunity for discovery, in the Trojan horse of a 'public record.'" *Whitten v. City of Omaha*, 199 F. Supp. 3d 1224, 1231 (D. Neb. 2016). Taking judicial notice of allegations or factual findings made in bankruptcy proceedings that do not name any of the Defendants to the present action, even if relevant, risks turning a motion to dismiss into a motion for "summary judgment

lite." The Court will disregard the Aspirity bankruptcy proceedings on its consideration of this motion.

**IV.    Mehta's Claims Against Moving Defendants**

The Court finally turns to the heart of the present motion to dismiss, the analysis of which benefits from a slight reframing. As noted, Mehta's Amended Complaint raises only two claims for unpaid wages and bonus pay stemming from his employment with Angell Energy and Chesapeake Trading, respectively. Counts Three and Four of the Amended Complaint, which the Moving Defendants seek to dismiss, merely state two theories of recovery against the Moving Defendants. That is, Moving Defendants ask the Court to dismiss all Defendants other than Angell Energy and Chesapeake Trading, and to dismiss Chesapeake Trading from Count One, not because the Amended Complaint fails to state claims for unpaid wages, but because it fails to state those claims against *them* with sufficient particularity. With this understanding of the motion in mind, the Court addresses the two theories of recovery in turn.

**A.    "Successor liability" as to Chesapeake and Pegasus (Count Three)**

Mehta seeks to hold Chesapeake Trading and Pegasus Energy liable for Angell Energy's debt to him on the theory that Chesapeake is the successor entity to Angell and Pegasus the successor to Chesapeake. A successor entity does not necessarily inherit the liabilities of its predecessor, *Nutt v. Kees*, 796 F.3d 988, 990 (8th Cir. 2015), and Moving Defendants do not challenge either of the counts in the Amended Complaint that state actual claims for relief. So, the question on this motion to dismiss is whether, taking Mehta's factual allegations as true, he has shown that the doctrine of successor liability as it exists in Minnesota plausibly applies to Chesapeake and Pegasus. He has.

14

In Minnesota, a transferee entity is liable for the transferor's liabilities "only to the extent provided in the contract or agreement between the transferee and the transferor or to the extent provided by [other state statutes] . . . . The transferee shall not be liable solely because it is deemed to be a continuation of the transferor." Minn. Stat. § 302A.661, subd. 4. Minnesota otherwise recognizes "no common law exceptions to the rule of transferee non-liability . . . ." *Id.* at reporter's notes to 2006 amendment. Although it does not cleanly delineate both theories, Mehta's Amended Complaint invokes both (1) assumption of liability by agreement and (2) fraudulent transfer under Minnesota's Uniform Voidable Transactions Act, formerly known as the Uniform Fraudulent Transfer Act, *see* Minn. Stat. § 513.51 (changing the short title of the Act).

### 1.    Agreement

Mehta alleges that Krieger, acting first on behalf of Chesapeake Trading and then Pegasus Energy, twice promised Mehta a "signing bonus" in partial satisfaction of outstanding debts owed to Mehta by each entity's predecessor.[6] The normal pleading standard of Rule 8 governs these allegations because the allegations do not, on their own, aver or even imply fraudulent conduct. *E.g.*, Miller, Kane, and Spencer, *supra*, § 1297; *see also Cedar Rapids Lodge & Suites, LLC v. Seibert*, No. 14-CV-04839 (SRN/KMM), 2018 WL 747408, at *7 (D. Minn. Feb. 7, 2018) (noting that, where a complaint alleged both actual and constructive fraud, Rule 9(b) applied only to the actual fraud claims). The Amended Complaint states a claim against both Chesapeake Trading and Pegasus Energy under Rule 8.

---

[6] The Court uses "successor" and "predecessor" only to describe the temporal relationship of the successive entities.

Taken as true, Mehta's Amended Complaint alleges the following pertinent facts. Krieger, the sole owner of Chesapeake Trading, acknowledged that he owed Mehta and others for unpaid trading bonuses at the time Angell Energy shuttered. Am. Compl. ¶¶ 46-48. He then offered Mehta a $50,000.00 signing bonus "to partially pay for Plaintiff's Angell Trading Bonus for which Timothy Krieger acknowledged owing." *Id.* at ¶ 49. Krieger made similar partial payment offers to the other employees of the East Windsor office.[7] *Id.* at ¶ 50.

As Moving Defendants accurately note, Mehta does not directly allege that either Chesapeake or Pegasus entered into an agreement to be liable for the debts of its predecessor. However, this Court may draw reasonable inferences from the allegations— and if it does so, such inferences must be in Mehta's favor. *Kelly v. City of Omaha, Neb.*, 813 F.3d 1070, 1075 (8th Cir. 2016). Here, Krieger twice recognized that Mehta was owed unpaid bonuses, and twice offered a "signing bonus" with the new company that, according to the Amended Complaint, was intended as partial satisfaction of the outstanding debt. The context in which the bonus was offered is more relevant than the label slapped upon it by either party. It is therefore reasonable to infer from these facts an agreement by Chesapeake, and then by Pegasus, to adopt its predecessor's financial liabilities to Mehta, even if it strikes this Court as unlikely to be proven through discovery. *See Bell Atl. Corp. v. Twombly*, 550 U.S. at 556 (explaining that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable").

---

[7] This allegation is made upon information and belief.

16

The inference of an agreement this Court draws is consistent with Rule 12. Plaintiffs such as Mehta are not privy to every business dealing of their employer, and it would be absurd to require, in effect, substantial pre-filing discovery of non-public records. Without the benefit of discovery, Mehta provided more than a "threadbare recital" that Chesapeake and Pegasus entered into agreements to assume the debt owed to him; he offered a reasonable basis for inferring the agreements' existence. And although the signing bonus offers are also consistent with a business attempting to retain a valuable employee, the context of the offer makes the agreement to assume liability plausible, rather than merely one of several equally possible inferences to draw. This distinguishes the present pleading from the one the Supreme Court addressed in *Twombly*, in which plaintiffs filed suit against their local telephone monopolies, known as incumbent local exchange carriers ("ILECs"). 550 U.S. at 549-51. There, the Court concluded plaintiffs rested their antitrust claim solely on conscious parallel business conduct, which was not enough to imply the existence of a conspiracy because such conduct was equally, if not more, consistent with wholly lawful business decisions. *Id.* at 564-66. Although the context in which Mehta received his bonus offers does not render the other interpretations impossible, that context pushes his theory into the realm of the plausible.

### 2.    Fraudulent transfer

Mehta has also sufficiently alleged Chesapeake's and Pegasus's liability under the Minnesota Voidable Transfers Act, which remains a basis for extending liability under Minnesota's successor liability statute. *See* Minn. Stat. § 302A.661, subd. 4 reporter's notes to 2006 amendment (using the MVTA's prior name). The MVTA voids the transfer from a debtor to another party when its requirements are met and allows the creditor to

avoid the transfer and seek attachment or equitable relief to accomplish this. *See* Minn.

Stat. § 513.47. The MVTA thus prevents a debtor from placing otherwise available assets

outside a creditor's reach either when the debtor makes the transfer with actual fraudulent

intent or when the law treats the transfer as constructively fraudulent. *Finn v. Alliance*

*Bank*, 860 N.W.2d 638, 644 (Minn. 2015).

To sustain a claim for actual fraud under the MVTA, a plaintiff must show "the

debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay,

or defraud any creditor of the debtor[.]" Minn. Stat. § 513.44(a)(1). He may make this

showing of actual intent through "badges of fraud." *Finn*, 860 N.W.2d at 845. The MVTA

provides a non-exhaustive list of eleven such badges:

> (1) the transfer or obligation was to an insider;
> (2) the debtor retained possession or control of the property transferred after the transfer;
> (3) the transfer or obligation was disclosed or concealed;
> (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> (5) the transfer was of substantially all the debtor's assets;
> (6) the debtor absconded;
> (7) the debtor removed or concealed assets;
> (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
> (11) the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

Minn. Stat. § 513.44(b). The Eighth Circuit has found the presence of three badges of

fraud sufficient to establish fraudulent intent. *In re Sherman*, 67 F.3d 1348, 1357 (8th Cir.

1995) (considering Missouri's Uniform Fraudulent Transfer Act).

The MVTA also allows a plaintiff to proceed under a theory of constructive fraud by showing both that the debtor "made the transfer . . . without receiving a reasonably equivalent value in exchange" and that the debtor either "was engaged or about to engage in a business or a transaction for which the remaining assets were unreasonably small" or intended to incur (or should have reasonably believed it would incur) "debts beyond the debtor's ability to pay as they became due."[8] Minn. Stat. § 513.44(a)(2); *see also Siebert*, 2018 WL 747408, at *13 (delineating actual and constructive fraud under the MVTA). However, neither the Amended Complaint nor Mehta's brief push the constructive fraud theory, as neither so much as mentions whether the transfers were for insufficient consideration. Instead, the Amended Complaint alleges an intent to defraud. So that is the theory the Court must analyze.

In considering allegations of actual fraud under the MVTA, this Court employs the heightened pleading standard of Rule 9(b). *Siebert*, 2018 WL 747408, at *7 (citing *Kranz v. Koenig*, 240 F.R.D. 453, 455 (D. Minn. 2007)). Rule 9(b) requires pleading the so-called "five fingers of fraud"—"the who, what, when, where, and how of the alleged fraud." *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007). Because the Rule is designed to give a defendant the opportunity to respond promptly to "potentially

---

[8] In their brief, Moving Defendants ignore both the structure of the statute and its use of the disjunctive, thereby erroneously running the actual and constructive fraud provisions together. *See* Mem. Supp. Defs.' Mot. Dismiss 10, Dkt. No. 41 ("Moreover, to properly plead fraudulent transfer claims under Minnesota law with sufficient particularity, a plaintiff must allege (1) actual intent to hinder, delay, or defraud a creditor; (2) the lack of reasonably equivalent value in exchange for the transfer; and (3) the debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or the debtor intended to incur or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."). Moving Defendants repeat this error in their reply brief. Reply Mem. 6, Dkt. No. 53.

damaging allegations of immoral or illegal conduct . . . [t]he level of particularity required depends on, *inter alia*, the nature of the case and the relationship between the parties." *Id.* (internal quotations and citations omitted). And, even under the heightened pleading requirements, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

The Amended Complaint sufficiently alleges Chesapeake's and Pegasus's liability, even under Rule 9(b). First, the nature of the present case and the relationship between Mehta and the Moving Defendants cautions against imposing too heightened a standard. This is not the classic case of fraud, where one party is induced by fraudulent statement to purchase a product or enter into an agreement to their detriment. Nor is Mehta in a position to know at the outset precisely what actions the Defendants took in their internal business dealings. Rather, Mehta is an outsider to much of the alleged conduct at issue. And, to the extent Mehta alleges any "badges of fraud" in his Amended Complaint, those badges go to the Defendants' intent, *see Finn*, 860 N.W.2d at 845, and so may be alleged generally. Fed. R. Civ. P. 9(b).

Taken together, the factual allegations in Mehta's Amended Complaint plausibly allege that Krieger and the entities he controls engaged in a business assets shell game, shutting down one entity after transferring its assets to a new one, only to repeat the process several times. Specifically, after selling Twin Cities Power to Angell Energy, Krieger maintained functional control over the original Twin Cities Power assets through a management agreement between Angell and Apollo, an entity under Krieger's sole control. When Angell Energy closed, Chesapeake Trading opened in its place with little change in day-to-day life for Mehta. That is, Chesapeake took substantially all of Angell's

assets, including its office space and employees. *See* Minn. Stat. § 513.44(b)(5). Because Krieger is allegedly the sole owner of Chesapeake, the assets that once belonged to him, and which he allegedly still controlled while they belonged to Angell, remained under his control after the transfer. *See id.* at § 513.44(b)(1)-(2). At the time Angell shuttered, it owed Mehta and other employees not-unsubstantial bonuses and wages, which makes the doubling of Mehta's base salary four months before it shut down all the more curious. *See id.* at § 513.44(b)(10). When Chesapeake closed just a little over a year after it opened, the Amended Complaint alleges Mehta experienced a strikingly similar pattern, with Krieger himself contacting Mehta and promising that nothing would change for Mehta if he agreed to work for Pegasus, except for another signing bonus and the promise of even greater trading bonuses to offset what Chesapeake already owed him. Mehta has therefore alleged with a sufficient degree of particularity the presence of several "badges of fraud" surrounding both of the transfers at issue.

The Court cannot say what else Mehta could reasonably be expected to know, and therefore allege with specificity, at this stage of the litigation. Perhaps tellingly, neither can the Moving Defendants. If the Moving Defendants face the concerns of uncertainty that underly Rule 9(b)'s heightened standard, they should be able to articulate them. Yet, after stating the applicable legal standards—or misstating, in the case of the MVTA— Moving Defendants devote three conclusory sentences to say that Mehta's Amended Complaint is too conclusory and so Count Three must be dismissed. Mem. Supp. Defs.' Mot. Dismiss 10. As explained above, the Court disagrees.

### B.    Piercing the corporate veil as to Krieger, Chesapeake Trading, Pegasus Energy, Apollo Energy, and Diversified Trading (Count Four)

Mehta has also sufficiently alleged that the Defendants identified in Count Four are liable to him under a veil-piercing theory. "While Minnesota courts have described the veil-piercing inquiry in terms of a two-part test—(1) abuse of the corporate form, and (2) fundamental unfairness—those prongs are intimately related." *A.P.I., Inc. Asbestos Settlement Tr. v. Home Ins. Co.,* 877 F. Supp. 2d 709, 726 (D. Minn. 2012) (internal citation omitted). A plaintiff may show abuse of the corporate form by demonstrating either that "the entity is used for a fraudulent purpose or the party is the alter ego of the entity." *Matson Logistics, LLC v. Smiens*, Civil No. 12-400 (ADM/JJK), 2012 WL 2005607, at *7 (D. Minn. June 5, 2012) (citing *Equity Trust Co. Custodian ex rel. Eisenmenger IRA v. Cole*, 766 N.W.2d 334, 339 (Minn. Ct. App. 2009)).

It is fairly debatable whether Rule 8 or Rule 9(b) applies to the veil-piercing theory in the Amended Complaint. Rule 9(b) applies only where fraud is an element of the veil-piercing claim, *e.g.*, *Burke v. Citigroup, Inc.*, 2006 WL 3483787, at *3 (D. Neb. Nov. 29, 2006), and the Amended Complaint could conceivably be read to proceed on an alter ego theory, despite Mehta's conclusory labelling. Nevertheless, Mehta does not challenge Moving Defendants' invocation of the heightened pleading standard, and the Court need not decide the issue, as the Amended Complaint sufficiently alleges the theory under Rule 9(b) in any event.

The Amended Complaint sufficiently alleges that the various entities were used for a fraudulent purpose because, for the reasons previously discussed, it sufficiently alleges that they were all part of Krieger's scheme to defraud creditors. For this reason, there is no need for the Court to go through the "alter ego" factors first articulated by the Minnesota

Supreme Court in *Victoria Elevator Co. v. Meridien Grain Co.*, 283 N.W.2d 509 (Minn. 1979). Similarly, fundamental fairness requires piercing the veil if Mehta can prove his allegations to be true, as not doing so would help accomplish the purpose of the alleged fraud by allowing Krieger to avoid liability through the various entities. "Whether those allegations will ultimately prove legally and factually sufficient is a matter not before the Court; at this time, it is enough that the pleadings provide sufficient particularity to survive a motion to dismiss." *Glover v. Standard Fed. Bank*, Civil No. 97-2068 (DWF/SRN), 2001 WL 34635707, at *3 (D. Minn. June 11, 2001).

## RECOMMENDATION

For the reasons articulated above, the Court RECOMMENDS THAT Defendants Chesapeake Trading Group, LLC; Pegasus Energy Futures, LLC; Apollo Energy Services, LLC; Diversified Trading Company, LLC; and Timothy Krieger's Motion to Dismiss [Dkt. No. 39] be DENIED.


Dated: April 1, 2020

> s/David T. Schultz
> DAVID T. SCHULTZ
> United States Magistrate Judge


## <u>NOTICE</u>

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).